UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN BARKSDALE, and JONATINA L. BARKSDALE,

Defendants.

Case No. 1:22-cv-1933

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against John Barksdale and JonAtina ("Tina") Barksdale (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.     From at least June 2017 to April 2018, Defendants John and Tina Barksdale fraudulently offered and sold unregistered securities in the form of subscription packages in Ormeus Global, S.A. ("Ormeus Global"), a multi-level marketing business.  Also starting in June 2017 and continuing through the present, Defendants fraudulently offered and sold unregistered securities in the form of the digital asset Ormeus Coin.  Neither the subscription packages nor Ormeus Coin was ever registered with the Commission as a security – although they should have been under the securities laws.

2.     The Ormeus Global subscription packages that Defendants offered and sold included access to a learning portal about digital assets, funds pooled and invested into a digital asset trading system, and tokens of Ormeus Coin.  Through Ormeus Global, Defendants marketed

the trading system as a proven program that could give investors passive returns of up to 160% of their initial investment.

3.      Defendants, through Ormeus Global and Ormeus Coin, represented to investors that Ormeus Coin would support its value by holding other digital assets earned through its digital asset mining operation.  They told investors that Ormeus Coin would permanently place 40% of the profits of the digital asset mining business into digital asset wallets known as the "Ormeus Reserve Vault," or "ORV," to support the value of Ormeus Coin, which also made the Ormeus Global packages more attractive to investors.  They further represented that the ORV would be publicly displayed at orv.ormeuscoin.com.

4.      Defendants knowingly or recklessly made misrepresentations and engaged in deceptive conduct relating to the duration and size of Ormeus Coin's digital asset mining operation.  Ormeus Coin mined digital assets for less than a year, from February 2018 until January 2019.  In that time, the entire operation generated less than $3 million in total revenue. Nevertheless, Defendants misrepresented at various times that the operation was generating $5.4 million to $8 million in revenue each month.  Defendants also misrepresented that Ormeus Coin had $30 million, $35 million, and $250 million worth of digital asset mining equipment at a time when it had less than $1 million of equipment in actual operation.  Those misrepresentations continued long after January 2019, when the operation ceased altogether.

5.      To preserve the fiction that Ormeus Coin was successfully mining digital assets, Defendants arranged for the ORV website to display as its own a digital asset wallet belonging to an unrelated third party, rather than the actual ORV digital asset wallets.  That third party's digital asset wallet first appeared on the ORV website in approximately January 2019 and continued to appear there until December 2021, after Defendants learned that the Commission might file this

enforcement action.  The digital assets in the displayed wallet (approximately 3081 bitcoin) were worth more than $190 million as of November 2021.   By contrast, the assets in the actual ORV digital asset wallets (approximately 7 bitcoin) were worth less than $500,000 as of November 2021.

6.     To this day, a document on the Ormeus Coin website, which Defendants reviewed and approved before it was posted, continues to misrepresent that Ormeus Coin has one of the largest digital asset mining operations in the world and that Ormeus Coin is actively mining digital assets in North America.  That document also refers current and prospective investors to the ORV website, which only became inactive in December 2021, to view what purported to be the ORV digital asset wallet but was in fact the digital asset wallet of a third party.

7.     Defendants have also launched additional digital assets, Ormeus Cash (OMC) and Ormeus Ecosystem (ECO), which purport to run in connection with Ormeus Coin.  A document on the Ormeus Cash website, which Defendants reviewed and approved before it was posted, falsely claims that Ormeus Coin has one of the biggest digital asset mining operations in the world.

8.     Additionally, Defendants and others working at their direction engaged in manipulative trading of Ormeus Coin in the days surrounding Ormeus Global roadshow events to boost the price of Ormeus Coin, which were included in Ormeus Global subscription packages. Coordinated trading designed to artificially inflate a security's market price is prohibited by the securities laws.  Defendants' knowing or reckless manipulation of the market deceived investors about the value of Ormeus Coin and therefore the value of Ormeus Global subscription packages.

9.     Through their fraudulent conduct, Defendants raised at least $124 million from over 20,000 investors in the United States and various countries across the globe.  Defendants have used

millions of dollars of investor money for their own personal benefit including for travel and to purchase real estate.

10.     By engaging in this conduct, as further described herein, Defendants violated and, unless restrained and enjoined by the Court, may continue to violate Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a), (c), q(a)], and Section 10(b) of the Securities Exchange Action of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## VENUE AND JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§77t(b) and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§§78u(d), 78u(e), and 78aa].  In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

12.     Venue is proper in this District pursuant to Securities Act Section 22 [15 U.S.C. §77v] and Exchange Act Section 27 [15 U.S.C. §78aa]. Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.  Defendants fraudulently offered and sold unregistered securities to investors within this District.

## DEFENDANTS

13.     **John Barksdale**, age 41, is a U.S. citizen who at all relevant times resided on the resort island of Ko Samui in Thailand.  He was the founder and primary entrepreneur behind Ormeus Global, S.A. ("Ormeus Global") and its digital tokens Ormeus Coin (ORME), Ormeus

Cash (OMC), and Ormeus Ecosystem (ECO).  Mr. Barksdale controlled the operations of Ormeus Global and Ormeus Coin, including its digital asset wallets, and personally solicited investors through webinars and in-person roadshows.  In these presentations, Mr. Barksdale routinely made material misrepresentations about Ormeus Coin and its mining operation to induce investments.  Mr. Barksdale also instructed Ormeus Global employees and officers to draft marketing materials, including whitepapers and press releases, containing material misrepresentations about Ormeus Coin and its digital asset mining operation, which he approved for publication.

14.     **JonAtina ("Tina") L. Barksdale**, age 45, is a U.S. citizen who at all relevant times resided in Hong Kong.  She is the sister of John Barksdale and with him controlled the operations of Ormeus Global and Ormeus Coin.  Tina Barksdale worked in Ormeus's Hong Kong office, was responsible for coordinating the marketing videos the company used to fashion itself as a legitimate company, and managed bank accounts for the business.  Like her brother, she also reviewed and approved marketing materials that contained material misrepresentations about Ormeus Coin and its digital asset mining operation.

### RELEVANT ENTITIES

15.     **Ormeus Global, S.A. ("Ormeus Global")** was a company organized in Panama on September 4, 2017, with its principal place of business in Hong Kong.  All of its corporate officers, however, resided in the United States.  Ormeus Global was a multi-level marketing company that offered subscription packages featuring a number of related products, including an algorithm-based trading system that traded digital assets for investors and the digital asset Ormeus Coin.  Ormeus Global has not been active since approximately April 2018 and has no assets.

16.     **Ormeus Coin (ORME)** is an ethereum-based ERC-20 digital asset that Defendants developed and first listed for trading in June 2017 on a now-defunct digital asset trading platform

in Hong Kong that they owned and controlled.  In September 2017, Ormeus Coin began trading on additional digital asset platforms including Cryptopia and HitBTC.  Since 2018, Defendants have represented to investors that the profits of a digital asset mining operation in North America supported the value of Ormeus Coin.

17.     Defendants created confusion publicly and among investors about the relationship between Ormeus Global and Ormeus Coin.  At times, Ormeus Global was identified as the issuer of Ormeus Coin and the owner of the digital asset mining operation.  At most other times, however, including in press releases, website, white papers, and on social media, Ormeus Coin was held out as a separate entity that owned the mining operation, even though it was a digital asset and not a corporate entity.

## FACTUAL ALLEGATIONS

18.     Defendants launched Ormeus Global in 2017 by hiring several U.S.-based officers who already worked for Defendants at a different marketing company, instructing the officers to incorporate the company in Panama, and arranging for Ormeus Coin to trade on Crytopia, a New Zealand Exchange.  Defendants also designed and produced promotional materials for Ormeus Global subscription packages, which offered access to a learning portal about digital assets, a pooled investment into a digital asset trading system, and tokens of Ormeus Coin.

19.     Promotional materials for the subscription packages promised investors that the digital asset trading system was a proven program through which investors could earn passive returns of up to 160% of their initial investment.  These promotional materials were available on Ormeus Global's public websites and in a private portal for existing investors to use to recruit new investors.  They were also shared with current and prospective investors on webinars and at roadshows conducted by John Barksdale.  Contrary to the representations in these materials, the

trading system was not a proven system and was still in development for months after Ormeus Global started selling subscription packages.

20.     A key selling point for both the subscription packages and Ormeus Coin, prominently featured in promotional materials produced by Defendants, was their plan to support the value of Ormeus Coin with other digital assets earned through its digital asset mining operation. Defendants, Ormeus Global, and Ormeus Coin told investors that 40% of the profits of the mining business would be placed into digital wallets known as the "Ormeus Reserve Vault," or "ORV," which would permanently hold the digital assets to support the value of Ormeus Coin.  They also represented that the ORV would be displayed on a public website so investors could monitor its value.  Defendants, Ormeus Global, and Ormeus Coin told investors that most or all of the remaining profits of the mining business would be used to purchase additional digital asset mining equipment and technology to continue to support the value of Ormeus Coin.

21.     Defendants and Ormeus Global offered and sold the Ormeus Global subscription packages from approximately June 2017 through April 2018 through its unrestricted website that was available to investors worldwide, raising at least $72 million from more than 8,600 investors, including at least 1,000 U.S. residents.  This securities offering was not registered with the Commission.

22.     Defendants have offered and sold the digital asset Ormeus Coin continuously from approximately June 2017 through the present.  Ormeus Coin has been available for purchase on digital asset trading platforms, principally Cryptopia, through the Barksdales' issuance and distribution of approximately 36 million Ormeus Coins directly to more than 12,800 investors, including at least 230 U.S. residents.  Ormeus Coin's highest market capitalization was $52 million

on January 15, 2018, based on its value in U.S. dollars at the time. This securities offering was not registered with the Commission.

### A.    The November 2017 Roadshow in Hong Kong

23.     On or around November 19, 2017, Ormeus Global hosted a roadshow in Hong Kong for current and prospective investors from around the world, including the United States. At the roadshow, the company formally opened its headquarters and marketed its subscription packages.

24.     Also at the roadshow, John Barksdale, in a highly staged moment in front of a crowd of investors, signed a purported contract for Ormeus Global to purchase $250 million worth of equipment to mine digital assets with an initial deposit of $10 million. John Barksdale intended the pomp and ceremony surrounding the execution of the contract to underscore to investors that Ormeus Global was about to undertake an enormous mining operation of digital assets, the profits of which would support the value of Ormeus Coin and, by extension,  make the subscription packages more attractive to investors.

25.     The document John Barksdale signed at the roadshow was not, in fact, a binding contract.  It lacked multiple key terms and called for the parties to execute a more definitive agreement within 30 days.  John Barksdale never told investors that this document was not a final contract, nor did he or anyone else ever disclose that the parties never executed a more definitive agreement.  Nevertheless, for years afterward, as detailed below, Defendants touted the $250 million figure from the document in marketing materials and promoted the purported contract as proof that the company was ramping up a digital asset mining operation on a massive scale.

**B.      Manipulative Trading Around the November 2017 Roadshow in Hong Kong**

26.      Prior to the roadshow event, John Barksdale bragged to the officers and employees of Ormeus, including his sister Tina Barksdale, that he had bought and sold Ormeus Coin to increase its value to $1.00 and would drive its value higher.  With his sister's assistance, he made good on that boast.

27.      In the days surrounding the roadshow in Hong Kong, Defendants and people they controlled at Ormeus Global bought and sold Ormeus Coin directly from and to each other using accounts they controlled at Cryptopia to drive up the price.  In principal part through their manipulative trading, the price of Ormeus Coin peaked at $5.30 on November 19, 2017, the day of the roadshow.

28.      Defendants manipulated the price of the coin to induce investors to purchase subscription packages at the roadshow in Hong Kong.  Because tokens of Ormeus Coin were included in the subscription packages, Defendants knowingly or recklessly misled investors about the value of the packages by artificially driving up the price of the coin.

29.      Through these efforts, together with the false information touted about Ormeus Global's $250 million mining contract, Ormeus Global sold $5.7 million worth of subscription packages during the week of the roadshow – more than double the sales in any prior week.

**C.      Ormeus Global's Minimal Mining Activity Through January 2018**

30.      Digital asset mining is the process of creating new digital assets by solving complex mathematical equations.  Digital assets miners or "miners" are devices used to mine digital assets.  At the time Defendants began promoting Ormeus Global and Ormeus Coin, only a handful of miners, located in Montana, were dedicated to mining on behalf of Ormeus Coin.

31.     Between approximately November 28 and December 3, 2017, John Barksdale transferred 845 bitcoins (just under $9 million at the time) to an equipment provider associated with the counterparty named in the purported $250 million contract for the purchase and hosting of mining equipment for Ormeus Global.  That deposit was the last payment Defendants, Ormeus Global, or anyone acting on their behalf, would ever make to acquire mining equipment from that company or anyone associated with it, a fact that was never disclosed to investors.  As detailed below, Ormeus Global did not receive and begin using this equipment until late February 2018.

32.     In December 2017, Defendants transferred approximately 150 miners from a different company they controlled to Ormeus Coin and installed it at a warehouse in Massena, New York.  Defendants struggled to keep the equipment operational and breaking even.

33.     Also in January 2018, the miners in Montana that were dedicated to Ormeus Coin's operations stopped working on behalf of Ormeus Coin and were replaced by miners located in Utah.  As of January 2018, therefore, the only digital asset mining equipment dedicated to Ormeus Coin's mining operation were located in Massena, New York and in Utah.  Taken together, this equipment was worth less than $1 million.

34.     On or around January 16, 2018, Defendants received an email from their equipment operator containing a report of Ormeus Coin's mining revenue, expenses, and profits.  That email showed that in the preceding 30 days, Ormeus Coin had revenue of less than $200,000 from mining digital assets.

**D.     The January 2018 Webinar**

35.     On or around January 8, 2018, John Barksdale held a live, publicly available webinar for current and prospective investors of Ormeus Global showing his PowerPoint

presentation, "Ormeus Coin: Money Making Machine."  Investors in the United States and around the world viewed this webinar.

36.     During the presentation, John Barksdale made multiple material misrepresentations about Ormeus Coin's current and projected assets and revenues.  Specifically, he claimed that Ormeus Coin had made an initial deposit of $35 million to purchase mining equipment, when in fact he knew or was reckless in not knowing that he and Ormeus Global had paid less than $9 million at that time.  He also claimed that Ormeus Coin had a $250 million contract to purchase mining equipment, though he knew or was reckless in not knowing that no such enforceable agreement existed.

37.     These misrepresentations about Ormeus Coin's mining operations were material to potential investors because 40% of the profits of the mining operation were supposed to be used to support the value of Ormeus Coin, and most or all of the remaining profits were to be reinvested into purchasing additional digital asset mining equipment and technology to further support this value.

38.     John Barksdale also made baseless representations in his webinar about Ormeus Coin's projected revenues from its mining operations.  He claimed that within the next four months, Ormeus Coin would earn $5 million per month and that it would eventually earn $36 million per month as it purchased more mining equipment.  These projections lacked any factual basis, yet John Barksdale presented them as a guarantee, using phrases like, "Mark my words." John Barksdale did not disclose any risks that threatened Ormeus Coin's ability to meet these projections, including: the difficulty of procuring mining equipment; the fact that mining equipment quickly becomes obsolete; and that Ormeus Coin had not secured a location to host and power all of the mining equipment it would need to meet these projections, if it ever managed to

procure it.  John Barksdale knew or was reckless in not knowing that these undisclosed risks existed.  These misrepresentations were material to potential investors because they created a false sense of certainty that Ormeus Coin would be valuable in the future, which affected the perceived value of both Ormeus Coin and Ormeus Global subscription packages.

### E. Manipulative Trading Around The January 2018 European Roadshows

39.     In the second half of January 2018, Ormeus Global hosted roadshows throughout Europe in cities including Oslo, Stockholm, Berlin, Krakau, and Vienna to sell subscription packages to investors.

40.     In the days surrounding the roadshows in Europe, Defendants and people they controlled at Ormeus Global drove up the value of Ormeus Coin, from a low of $1.85 on January 12, 2018 to a high of $2.98 on January 21, 2018, by trading directly with each other at Cryptopia.

41.     Defendants knowingly or recklessly manipulated the value of the coin to induce investors at the roadshows in Europe into purchasing subscription packages by making it appear that there was an active market for Ormeus Coin that was increasing in value.  In principal part through these efforts, Ormeus Global sold approximately $3 million worth of subscription packages during the last three weeks of January 2018.

### F. The Misleading "Ormeus Coin – Mining Facility" Video

42.     On or around February 5, 2018, a video was published on Ormeus Coin's YouTube page entitled "Ormeus Coin – Mining Facility" that purported to feature an Ormeus Coin facility located in Montana housing approximately $25 million of mining equipment.  John Barksdale gave instructions to the speaker in the video regarding what to say, and Tina Barksdale was responsible

for coordinating with the videographer and photographer to shoot and edit the video. The video was subsequently published on the public landing page of Ormeus Coin's website.

43.     By the time the video was published, no equipment at this facility was part of Ormeus Coin's mining operation. Moreover, only a small number of the miners in the facility had ever mined on behalf of Ormeus Coin, whereas the video gives the impression that the entire facility was part of Ormeus Coin's operation. The video features approximately $25 million of operational equipment, whereas as of February 5, 2018, Defendants, Ormeus Global and/or Ormeus Coin had only about $1 million in operational equipment and had paid less than $9 million to purchase additional equipment. The video is therefore highly misleading regarding the size of Ormeus Coin's mining operation as of February 2018.

44.     Defendants knowingly or recklessly created and published the video to mislead investors into believing that Ormeus Coin had tens of millions of dollars of equipment actively mining digital assets to prop up the value or Ormeus Coin. The video was publicly available on the Ormeus Coin website, is still available on the Ormeus Coin YouTube page, and was distributed to Ormeus Global investors through email at the Defendants' direction and approval.

### G.     The February 2018 Whitepaper and Related Promotional Materials

45.     On or around February 8, 2018, a whitepaper titled, "The Tokenization of Industrial Cryptocurrency Mining," was published on Ormeus Coin's public website. Prior to publication, Defendants hired the author, reviewed the whitepaper several times, and approved the final draft for publication to the website.

46.     The whitepaper misrepresented that Ormeus Coin had $30 million worth of mining equipment, that it generated $5.4 million in revenue per month from its mining operation, that

those asset and revenue figures had been audited, and that Ormeus Coin had an agreement with a hydrodam in New York to obtain inexpensive and clean electricity.

47.     None of those claims was true, which Defendants knew or were reckless in not knowing at the time they approved them for publication.  At the time of publication, Ormeus Coin had purchased less than $10 million of digital asset mining equipment, had only about $1 million of such equipment in actual operation, was producing less than $200,000 of mining revenue per month, had never had its financial statements or mining assets audited, and did not have an agreement with a hydrodam in New York.

48.     On February 9, 2018, Defendants issued a press release under the name of Ormeus Coin entitled "$250 Million Cryptocurrency Mining Farm Revealed in Legal Audit by Ormeus Coin" using a news wire service called PR Newswire.  A link to this press release also appeared on the Ormeus Coin Twitter and Facebook social media accounts.

49.     Defendants hired the author of the whitepaper to draft the press release and approved its publication.  The press release misrepresented that Ormeus Coin had a $250 million mining operation and was producing $6.7 million in revenue per month.  The press release also embedded the video from February 5, 2018 entitled, "Ormeus Coin – Mining Facility."  Again, at this time, Ormeus Coin had purchased less than $10 million of digital asset mining equipment, had only about $1 million of such equipment in actual operation, was producing less than $200,000 of mining revenue per month, and did not own the facility or any of the equipment shown in the video.  Defendants knew or were reckless in not knowing that the press release and video were false and misleading when they approved them for publication.

50.     On February 9, 2018, Ormeus Global, at the direction of John Barksdale, emailed the February 9, 2018 press release, including the misrepresentations concerning Ormeus Coin's

assets and mining revenue, to all Ormeus Global investors who had purchased subscription packages. Existing investors thereafter purchased additional Ormeus Coins and/or recruited additional investors consistent with Ormeus Global's multilevel marketing model.

51.     On February 12, 2018, Ormeus Global and Ormeus Coin published ads on their Twitter and Facebook accounts and a video on YouTube appearing to show Ormeus Coin advertising in Times Square in New York City. The social media ad on Twitter stated, "Live from New York City, Ormeus Coin advertising its $250 million Cryptocurrency Mining Farm in Times Square, Manhattan!" This advertisement was false: Ormeus Coin had purchased less than $10 million of digital asset mining equipment and had only about $1 million of such equipment in actual operation. Defendants acted knowingly or recklessly in reviewing and approving this advertisement before Ormeus Global and Ormeus Coin published it.

52.     On February 16, 2018, Defendants, under the name of Ormeus Coin, issued a press release through PR Newswire entitled "Ormeus Coin Mining Profits Reach $5.4 Million per Month." A link to this press release also appeared on Ormeus Coin's Twitter and Facebook social media accounts.

53.     Defendants hired the author of the whitepaper to draft the press release and approved its publication. The press release misrepresented that Ormeus Coin had a $250 million mining operation and was producing $5.4 million in revenue per month. The press release also included an image from the facility depicted in the February 5, 2018 YouTube video and falsely called it "the Ormeus Coin industrial cryptocurrenty mining operations in North America." As explained above, Defendants, Ormeus Global and/r Ormeus Coin had purchased less than $10 million of digital asset mining equipment, had only about $1 million of such equipment in actual operation, were producing less than $200,000 of mining revenue per month. Additionally, neither

the facility nor the equipment depicted in the video belonged to Ormeus Coin or any related person or entity.  These misrepresentations were material because the size of the mining operation affected potential investors' impression of the value of Ormeus Coin and the Ormeus Global subscription packages.   Defendants acted knowingly or recklessly in approving this press release for publication.

**H.    The March 2018 Mining Tour and Defendants' Further Manipulative Trading of Ormeus Coin**

54.     On or around March 17 through March 19, 2018, Ormeus Global and Ormeus Coin hosted a mining tour in Utah to show several hundred foreign and U.S. investors three shipping containers that were being built to host Ormeus Coin's digital asset mining equipment.  Investors also visited a fixed data center containing additional equipment.  While the equipment in the shipping containers did belong to Ormeus Global or Ormeus Coin, it was not yet operational.  Only some of the equipment at the fixed data center belonged to either Ormeus Global or Ormeus Coin. John Barksdale instructed Ormeus Global employees to create the tour to promote the business.

55.     Defendants also arranged to have the tour filmed for release to the broader public. Tina Barksdale was responsible for coordinating with the videographer and photographer to shoot and edit video of the event, and John Barksdale instructed the individual appearing in the video regarding what to say.

56.     On or around March 26, 2018, Defendants and Ormeus Coin published a video titled "Ormeus Coin Mining Tour" on YouTube showing footage from the mining tour.  The video is misleading in that it gives the false impression that all of the equipment featured belonged to Ormeus Coin, when in fact Ormeus Global or Ormeus Coin only owned a portion of the equipment at the fixed data center.

57.     Defendants acted knowingly or recklessly in shaping and approving the content of the video before it was released to the public. They knew or was reckless in not knowing that the equipment featured at the fixed data center did not all belong to Ormeus Coin.  They also knew or was reckless that the video as a whole misrepresented the size of Ormeus Coin's mining operation, especially when considered in the context of the prior video, entitled "Ormeus Coin – Mining Facility," which showed tens of millions of dollars of different equipment that also did not belong to Ormeus Coin.  These videos together misrepresented to investors that Ormeus Coin was mining digital assets on a massive scale.

58.     In the days surrounding the mining tour and the subsequent publication of the mining tour video on YouTube, Defendants and Ormeus Global employees working at their direction manipulated the value of Ormeus Coin, from a low of $1.05 on March 18, 2018 to a high of $3.24 on March 27, 2018, by trading directly with each other through accounts they held at Cryptopia.  During the period of March 17 through March 30, 2018, Defendants and Ormeus Global employees working at their direction traded 89% of all Ormeus Coins traded.  Defendants knowingly or recklessly manipulated the value of the coin to induce investors into purchasing subscription packages.  Ormeus Global sold approximately $4.5 million worth of subscription packages during the last two weeks of March 2018 while the price of Ormeus Coin remained artificially inflated.

**I.     April 2018 False and Misleading Promotional Materials**

59.     Ormeus Global received the digital asset mining equipment it purchased in November and December 2017 no earlier than February 22, 2018.  On or around April 1, 2018, a third of these digital asset miners actually started to mine bitcoin.  Prior to this date, the company had only about $1 million of equipment mining digital assets.

60.     From at least April 2, 2018, the Ormeus Coin website stated that Ormeus Coin was generating almost $8 million of revenue per month as of February 2018.  John Barksdale told an independent contractor of Ormeus Global to publish this information to the website despite knowing or being reckless in not knowing that Ormeus Coin was producing less than $200,000 of mining revenue per month as of February 2018.

61.     On April 4, 2018, Defendants, under the name of Ormeus Coin, published a press release through Business Wire entitled "Ormeus Coin Outsmarts Other Virtual Currencies with Transparent Proof of Mining Reserve Vault."  A link to this press release also appear on Ormeus Coin's Twitter and Facebook accounts.

62.     Defendants hired the author of the whitepaper to draft the press release and approved its publication.  The press release misrepresented that Ormeus Coin had a $250 million digital asset mining operation that was producing $7 million in revenue per month.  In fact, Ormeus Global had purchased less than $10 million of mining equipment and was producing less than $200,000 of mining revenue per month.  These misrepresentations were material because the size of the mining operation affected potential investors' impression of the value of Ormeus Coin and the Ormeus Global subscription packages.  Defendants acted knowingly or recklessly in approving this press release for publication.

**J.     The April 2018 Roadshow in Bangkok**

63.     On or around April 16 through April 18, 2018, Ormeus Global hosted a roadshow in Bangkok, Thailand where it promoted its subscription packages and Ormeus Coin's digital asset mining operations to current and prospective investors.

64.     Surrounding the roadshow in Bangkok, Defendants and other individuals working at their direction materially manipulated the value of Ormeus Coin from a low of $1.59 on

April 11, 2018, to a high of $3.38 on April 16, 2018, by trading directly with each other through accounts they controlled at Cryptopia.  Defendants knowingly or recklessly manipulated the value of the coin to induce investors into purchasing subscription packages at the roadshow.  Ormeus Global sold approximately $3.9 million worth of subscription packages during the last week of April 2018 while the value of Ormeus Coin remained artificially inflated.

### K.    Ormeus Coin Stops Mining Cryptocurrency, But Does Not Tell Investors

65.    In April 2018, Ormeus Coin transferred $15 million in Ormeus Coin to purchase digital asset mining equipment in China.  This equipment only operated in May through September of 2018, and it generated only approximately $2.5 million in total revenues in that time.

66.    From March 5 to June 1, 2018, the price of bitcoin dropped in value from approximately $11,600 per bitcoin to $7,500, or a decrease of 35%.

67.    On or about May 19, 2018, the company hosting the digital asset mining equipment in Utah sent an email to Defendants detailing the operation's mining revenue, expenses, and profits.  In the preceding 42 days, Ormeus Coin had revenue of less than $9,000 from mining digital assets.

68.    On or about June 1, 2018, as the value of bitcoin continued to decrease, Ormeus Coin's mining equipment in New York and Utah was turned off and stopped mining digital assets.  Defendants and Ormeus Coin made no disclosures to investors and did not correct any prior misstatements about its mining success to date.

69.    On or about November 12, 2018, Ormeus Coin's mining equipment in Utah was turned back on.  From November 12, 2018 through January 12, 2019, Ormeus Coin's mining equipment produced losses of about $115,000.

70.    On or about January 2019, Ormeus Coin's mining equipment in Utah was permanently turned off and put into storage.

71.    None of these events were ever disclosed to investors.

**L.    Ormeus Coin Displays a Third Party's Digital Wallet as Its Own**

72.    Defendants and Ormeus Coin told investors that the "Ormeus Reserve Vault" or "ORV" would hold 40% of Ormeus Coin's profits from its digital asset mining operations as a way of supporting the value of Ormeus Coin.  Despite their misrepresentations to investors that Ormeus Coin was earning monthly revenues of over $5 million from its mining activities, in total, the ORV only ever received approximately $2 million in digital assets.

73.    On or about January 30, 2019, to continue the fiction that Ormeus Coin had a robust digital asset mining operation that was generating profits to support the value of Ormeus Coin, Defendants negotiated a contract to display a third party's digital asset wallet on the ORV website rather than the actual assets of the ORV.  This digital asset wallet held approximately 3,081 bitcoins, which were earned through a venture unrelated to Ormeus Coin or its digital asset mining operation.  The assets in the displayed wallet in no way support the value of Ormeus Coin.

74.    Defendants arranged to publicly display the value of this digital asset wallet on the ORV website, orv.ormeuscoin.com, from approximately January 2019 until approximately December 2021, after Defendants learned that the Commission might file this enforcement action. As of November 3, 2021, the website misrepresents to investors that there are nearly $190 million of bitcoin supporting the value of Ormeus Coin.  By contrast, the approximately 7 bitcoins remaining in the actual ORV wallets were worth less than $500,000 as of November 2021. Defendants acted knowingly or recklessly in arranging for the website to display this digital wallet and mislead investors.

**L.      Ormeus Coin Continues to Misrepresent Its Digital Asset Mining Operation**

75.      On or about April 11, 2019, an updated version of Ormeus Coin's whitepaper version was posted to the Ormeus Coin website.  In the whitepaper, Ormeus Coin continues to misrepresent that it has one of the largest digital asset mining operations in the world, that it is actively mining digital assets in North America, and that it has an agreement with a hydrodam for renewable energy in New York.  The whitepaper also continues to refer current and prospective investors to the ORV website, which only became inactive in December 2021, to view what purports to be the ORV digital asset wallet but is in fact the digital asset wallet of an unrelated third party.  Defendants reviewed the whitepaper and approved it for publication to the website, despite knowing or being reckless in not knowing that Ormeus Coin had not mined any digital assets for several months, that no agreement with a hydrodam in New York exists, and that the digital wallet displayed on the ORV website did not belong to Ormeus Coin.

76.      Defendants have also launched additional digital assets, Ormeus Cash (OMC) and Ormeus Ecosystem (ECO), which purport to run in connection with Ormeus Coin.  In the whitepaper for Ormeus Cash, which appears on the Ormeus Cash website at ormeuscash.com, Ormeus Cash misrepresents that Ormeus Coin has one of the largest digital asset mining operations in the world and is actively mining digital assets in North America.  Defendants reviewed the whitepaper and approved it for publication to the website, despite knowing or being reckless in not knowing that Ormeus Coin has not mined digital assets since early 2019.

77.      Through their fraudulent conduct, Defendants raised at least $124 million from over 20,000 investors in the United States and various countries across the globe.  Defendants have used millions of dollars of investor money for their own personal benefit including for travel and to purchase real estate.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Against All Defendants)

78.     The Commission realleges and reincorporates paragraphs 1 through xx as if fully set forth herein.

79.     Defendants, directly or indirectly, by use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.   In connection with the offer and sale of Ormeus Global subscriptions packages and Ormeus Coin, Defendants made material misrepresentations of fact and engaged in other deceptive conduct, including but not limited to the manipulative trading of Ormeus Coin and their participation the creating, drafting, editing, and approval of Ormeus promotional materials containing material misrepresentations.

80.     By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Securities Act Section 17(a) [*15 U.S.C. § 77q(a)*].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

81.     The Commission realleges and reincorporates paragraphs 1 through xx as if fully set forth herein.

82.     By reason of the conduct described above, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly (1) employed devices, schemes, or artifices to defraud and/or (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (3) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.  In connection with the purchase and sale of Ormeus Global subscriptions packages and Ormeus Coin, Defendants made material misrepresentations of fact and engaged in other deceptive conduct, including but not limited to the manipulative trading of Ormeus Coin and their participation the creating, drafting, editing, and approval of Ormeus promotional materials containing material misrepresentations.

83.     By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**THIRD CLAIM FOR RELIEF**
**Violations of Securities Act Section 5(a) and (c)**
**(Against All Defendants)**

84.     The Commission realleges and reincorporated paragraphs 1 through xx as if fully set forth herein.

85.     By engaging in conduct alleged above, Defendants, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce, or of the mails, offered to sell or sold securities, or carried or caused such securities to be carried through

the mails or in interstate commerce for the purpose of sale or for delivery after sale.  Defendants created, drafted, edited, and approved promotional materials for Ormeus Global subscription packages and for Ormeus Coin, and John Barksdale made presentations at roadshows and in webinars to induce investors to purchase these securities.  Defendants directly or indirectly received proceeds from the sale of these securities.

86.     No registration statement was filed with the Commission or was in effect with respect to the securities offered by Defendants prior to the offer or sale of these securities.

87.     By engaging in the foregoing misconduct, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)     finding that each Defendant violated the antifraud and registration provisions of the federal securities laws as alleged herein;

(b)     permanently enjoining each Defendant from violating Securities Act Sections 5(a), 5(c), and 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder;

(c)     permanently enjoining each Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer;

(d)     ordering each Defendant to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of their illegal conduct;

(e)     ordering each Defendant to pay civil penalties pursuant to Securities Act Section 20(d) [*15 U.S.C. § 77t(d)*] and Exchange Act Section 21(d) [*15 U.S.C. § 78u(d)*]; and

(f)      granting such other relief to the Commission as the Court may deem just and proper.

Dated: March 8, 2022

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

S/ Melissa J. Armstrong
Melissa J. Armstrong*

*Application for admission *pro hac vice*
pending

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: (2020) 551-4724
armstrongme@sec.gov