UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

          v.

JOHN BARKSDALE, and JONATINA L.
BARKSDALE,

                              Defendants.

---

Case No. 1:22-cv-1933 (LAK)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A DEFAULT JUDGMENT

Melissa J. Armstrong*
Christopher J. Carney
Matthew B. Reisig
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: 202-551-2379 (Carney)
Attorneys for Plaintiff U.S. Securities and Exchange Commission

*Admitted *pro hac vice*

# TABLE OF CONTENTS

PROCEDURAL HISTORY..................................................................................................... 1

FACTS ALLEGED IN THE COMPLAINT ..................................................................... 2

PROCEDURAL HISTORY..................................................................................................... 1

ARGUMENT ............................................................................................................................ 7

I.      Default Judgment Standard............................................................................................ 7

II.     Defendants Offered and Sold Securities ..................................................................... 9

III.    Final Judgment Should Be Entered Against Defendants On The SEC's Section 10(b) and 17(a) Claims....................................................................................................................... 11

    A.  Defendants Violated Sections 10(b)  of the Exchange Act and 17(a) of the Securities Act ............................................................................................................... 11

    B.  The Antifraud Provisions of the Securities Act and the Exchange Act Apply To Defendants' Conduct ........................................................................................... 16

IV.     Final Judgment Should Be Entered Against Defendants on the SEC's Section 5 Claim .. 19

    A.  Defendants Violated Sections 5(a) and 5(c) of the Securities Act.................................... 19

    B.  Section 5 Extends To Defendants' Conduct BecauseThey Engaged in Efforts to Create A U.S. Market For Securities................................................................................. 21

V.      The Court Should Enjoin Defendants Against Future Violations of Sections 10(b), 17(a) and 5........................................................................................................................ 23

VI.     The Court Should Order Defendants to Pay Disgorgement and Prejudgment Interest ..... 24

    A.  Defendants' Profited from the Sale of Ormeus Subscription Packages .......................... 25

    B.  Defendants' Profited from the Sale of Ormeus Coin........................................................ 26

    C.  Deduction for Expenses Related to the Purchase of Mining Equipment.......................... 28

    D.  Prejudgment Interest ........................................................................................................ 29

VII.    The Court Should Impose Civil Penalties on Defendants ................................................. 30

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978 (1988)........................................................ 13

*Daniello v. Planned System Integration*, No. 07- cv-1729 (RRM), 2009 WL 2160536, (E.D.N.Y. July 17, 2009)................................................................................................................................. 9

*Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869 (2010)............................................................................................. 21, 22

*F.T.C. v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502 (S.D.N.Y. 2000) .................................... 14

*Finkel v. Romanowicz*, 577 F.3d 79 (2d Cir. 2009) ...................................................................... 8

*Liu Meng-Lin v. Siemens AG,* 763 F.3d 175 (2d Cir. 2014) ........................................................ 16

*Liu v. SEC*, 140 S. Ct. 1940 (2020)................................................................................. 24, 28, 29

*Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013), *aff'd sub nom. Liu Meng-Lin*, 763 F.3d 175 (2d Cir. 2014)................................................................................. 17

*Revak v. SEC Realty Corp.*, 18 F.3d 81(2d Cir. 1994)) ................................................................ 10

*SEC v. AbsoluteFuture.com*, 393 F.3d 94 (2d Cir.2004) ............................................................. 29

*SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020) ...................................................................................................................................... 23, 31

*SEC v. Amerindo Investment Advisors, Inc.*, No. 05 Civ. 5231(RJS), 2014 WL 2112032 (S.D.N.Y. May 6, 2014), *aff'd*, 639 F. App'x 752 (2d Cir. 2016)...................................... 31, 32

*SEC v. Blackout Media Corp.*, No. 09-cv-05454 (GBD) (DF), 2012 WL 4051937 (S.D.N.Y. May 15, 2012) ...................................................................................................................................... 9

*SEC v. Cavanagh*, 155 F. 3d 129 (2d Cir. 1998) ......................................................................... 23

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016) ............................ 12, 14, 15

*SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2011) ................................................................ 30

*SEC v. Cole*, 661 Fed. Appx. 52 (2d Cir. 2016) .................................................................. 8, 32

*SEC v. Cope*, No. 14 Civ. 7575 (DLC), 2021 WL 653088 (S.D.N.Y. Feb. 19, 2021) ................ 25

*SEC v. Dang*, No. 20 Civ. 01353 (JAM), 2021 WL 1550593 (D. Conn. Apr. 19, 2021) ............. 29

*SEC v. Edwards*, 540 U.S. 389, 124 S. Ct. 892 (2004) ............................................................ 11

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, (2d Cir. 1996) .............................................. 24, 29

*SEC v. Fowler*, 440 F. Supp. 3d 284 (S.D.N.Y. 2020) .............................................................. 32

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ...................................................... 14, 16, 19, 20, 23

*SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147 (S.D.N.Y. 2011) ........................................ 21

*SEC v. Gruss,* 859 F. Supp. 2d 653 (S.D.N.Y. 2012*)* ................................................................ 17

*SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159 (GEL), 2002 WL 1968341 (S.D.N.Y.

    Aug. 23, 2002) ................................................................................................................... 25

*SEC v. Jean-Pierre*, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, (S.D.N.Y. Mar. 9, 2015) ..... 12

*SEC v. Monarch Funding Corp.,* 192 F.3d 308 (2d Cir.1999) .................................................... 12

*SEC v. Moran*, 944 F. Supp. 286 (S.D.N.Y. 1996) .................................................................... 30

*SEC v. Morrone,* 997 F.3d 52 (1st Cir. 2021) .......................................................................... 17

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ................................................................ 12, 14, 16

*SEC v. Penn*, No. 14 Civ. 581 (VEC), 2021 WL 1226978 (S.D.N.Y. Mar. 31 2021) *aff'd* No. 21-

    1348-CV, 2022 WL 2517218 (2d Cir. July 7, 2022) ........................................................ 29

*SEC v. Rajaratnam*, 918 F.3d 36 (2d Cir. 2019) ...................................................................... 31

*SEC v. Ralston Purina Co.*, 346 U.S. 119, 73 S. Ct. 981 (1953) ................................................ 20

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ........................................................ 25, 30, 31

*SEC v. Riel*, 282 F. Supp. 3d 499 (N.D.N.Y. 2017)........................................................ 30

*SEC v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020) .......... 8, 24

*SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2022 WL 762966 (S.D.N.Y. Mar. 11, 2022)

.................................................................................................................................... 21

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) ............................................... 12, 13

*SEC v. Sayid*, No. 17 Civ. 2630 (JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019) *aff'd*, 860

F. App'x 18 (2d Cir. 2021).................................................................................. 13

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019)...................................................... 17

*SEC v. Skelley*, No. 18 Civ. 08803 (LGS) (DF), 2021 WL 863298 (S.D.N.Y. Feb. 25, 2021),

*report and recommendation adopted*, No. 18-cv-08803 (LGS), 2021 WL 1164594 (S.D.N.Y.

Mar. 26, 2021)...................................................................................................... 8

*SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) ...................................................... 12

*SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020)................. 15

*SEC* v. *Tecumseh Holdings Corp.*, No. 03 Civ. 5490 SAS, 2011 WL 2076466 (S.D.N.Y. May 24,

2011) ....................................................................................................................... 29

*SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................. 9, 10, 11

*SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552 (S.D.N.Y. 2009)............................... 31

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100 (1946)................................... 9, 10

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998)................................................................. 24

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017)...................................................... 13

*SEC. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013).......................... 11, 12, 29, 31

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105 (2d Cir. 1997).. 9

*United Housing Found., Inc. v. Forman*, 421 U.S. 837, 95 S. Ct. 2051 (1975)........................... 9

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)....................................................... 15

*United States v. Gramins*, 939 F.3d 429 (2d Cir. 2019) ..................................................... 13

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ...................................................... 19

**Statutes**

15 U.S.C. § 77b........................................................................................................ 9, 21

15 U.S.C. § 77e............................................................................................................. 2

15 U.S.C. § 77e(a)(1)................................................................................................... 19

15 U.S.C. § 77e(a)(2)................................................................................................... 19

15 U.S.C. § 77e(c)........................................................................................................ 19

15 U.S.C. § 77t(b)........................................................................................................ 23

15 U.S.C. § 77t(d)........................................................................................................ 30

15 U.S.C. § 77v(a)....................................................................................................... 16

15 U.S.C. § 77v(c).................................................................................................. 16, 17

15 U.S.C. § 78aa(a)..................................................................................................... 16

15 U.S.C. § 78aa(b)..................................................................................................... 17

15 U.S.C. § 78j(b)......................................................................................................... 2

15 U.S.C. § 78u(d)........................................................................................ 23, 24, 28, 30, 31

15 U.S.C. §§ 77t(d)(2)(C).............................................................................................. 31

15 U.S.C. §78aa(b)....................................................................................................... 17

15 U.S.C. §78j(b).......................................................................................................... 2

15 USC § 77t(b)............................................................................................................ 23

15 USC § 77t(d)...................................................................................................... 30, 31

15 USC § 78u ......................................................................................................... 23, 24, 28, 30, 31

**Rules**

17 C.F.R. §240.10b-5 ........................................................................................................ 2, 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

v.

JOHN BARKSDALE, and JONATINA L.
BARKSDALE,

                              Defendants.

---

Case No. 1:22-cv-1933 (LAK)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR A DEFAULT JUDGMENT

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this
memorandum of law in support of its motion to enter final judgment against Defendants
John Barksdale ("Mr. Barksdale) and JonAtina L. Barksdale ("Ms. Barksdale")
(collectively, "Defendants") pursuant to Rule 55(b)(2) of the Federal Rules of Civil
Procedure and Local Rule 55(b)(2).

## PROCEDURAL HISTORY

The SEC commenced this action on March 8, 2022, seeking injunctive relief,
disgorgement, and civil penalties against the Barksdales for securities fraud and the
unregistered offers and sales of securities in violation of federal law.  Dkt. No. 1. On March 14,
2022, the SEC filed its First Amended Complaint ("Complaint") seeking the same relief against
the Defendants.  Dkt. No. 6.

On June 20, 2022, Mr. Barksdale was personally served overseas with the Summons and
Complaint, as reflected in the proof of service filed under seal with the Court on June 30, 2022.

Dkt. No. 18.  The time for Mr. Barksdale to answer or otherwise move with respect to the Complaint expired on July 11, 2022.

On June 28, 2022 the Court issued an order directing the SEC to serve Ms. Barksdale by the alternative means of email pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure. Dkt. No. 15.  On June 30, 2022, counsel for the SEC emailed Ms. Barksdale the Summons and Complaint in this action, as reflected in the July 1, 2022 declaration of service.  Dkt. No. 19. The time for Ms. Barksdale to answer or otherwise move with respect to the Complaint expired on July 21, 2022.  On August 18, 2022, the Clerk of the Court entered a Clerk's Certificate of Default as to both Defendants.  Dkt. No. 22.

## FACTS ALLEGED IN THE COMPLAINT

In its Complaint, the SEC alleged that from at least June 2017 to May 2018, Defendants John and Tina Barksdale engaged in fraudulent, unregistered offers and sales of securities in the form of subscription packages in Ormeus Global, S.A., a multi-level marketing business. Complaint, ¶ 1.  Also starting in June 2017 and continuing through the present, Defendants engaged in fraudulent, unregistered offers and sales of securities in the form of the crypto asset security Ormeus Coin.  *Id.*  Neither the subscription packages offers and sales nor the Ormeus Coin offers and sales were ever registered with the Commission as a security – although they should have been under the securities laws.  *Id.*  By engaging in this conduct, as further described below, Defendants violated and, unless restrained and enjoined by the Court, may continue to violate Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a), (c), q(a)], and Section 10(b) of the Securities Exchange Action of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].  *Id.*, ¶ 10.

Mr. Barksdale was the founder and primary entrepreneur behind Ormeus Global, S.A. and its digital tokens Ormeus Coin, Ormeus Cash, and Ormeus Ecosystem. *Id*., ¶ 13. Mr. Barksdale controlled the operations of Ormeus Global and Ormeus Coin, including its crypto asset wallets. He personally solicited investors through webinars and in-person roadshows. *Id*. Mr. Barksdale routinely made material misrepresentations about Ormeus Coin and its mining operations in these presentations in an effort to induce investments. *Id.* Further, Mr. Barksdale instructed Ormeus Global employees and officers to draft marketing materials containing material misrepresentations about Ormeus Coin and its crypto asset mining operations, which he approved for publication. *Id*.

Ms. Barksdale is the sister of Mr. Barksdale and controlled the operations of Ormeus Global and Ormeus Coin with him. *Id*., ¶ 14. She worked in Ormeus Global's Hong Kong office, was responsible for coordinating the marketing videos the company used to give the impression that it was a legitimate company, and managed bank accounts for the company. Like her brother, she reviewed and approved marketing materials that contained material misrepresentations about Ormeus Coin and its crypto asset mining operations. *Id*.

In 2017, Defendants launched Ormeus Global by hiring several U.S.-based officers who already worked for Defendants at a different marketing company, instructing the officers to incorporate the company in Panama, and arranging for Ormeus Coin to trade on Prescott Regency, a Hong King crypto asset trading platform they controlled, and Cryptopia, a New Zealand crypto asset trading platform. *Id*., ¶ 18. Defendants also designed and produced promotional materials for Ormeus Global subscription packages, which offered access to a learning portal about crypto assets, a pooled investment into a crypto asset trading system, and Ormeus Coin tokens. *Id*.

The promotional materials prepared by the Defendants made false representations to investors that the Ormeus crypto asset trading system was a proven platform through which these

3

investors could earn passive returns up to 160% of their initial investment.  *Id.*, ¶ 19.  Defendants made these promotional materials available on their public websites and in a private portal through which investors enrolled and through which they could recruit others into Ormeus Global.  The materials were also shared with investors during webinars and at roadshows Mr. Barksdale conducted.  *Id.*

In their promotional materials, Defendants prominently featured their plan to bolster the value of Ormeus Coin with other crypto assets earned through their crypto asset mining operation.  *Id.*, ¶ 20.  Crypto asset mining is the process of creating new crypto assets by using devices called "miners" to solve complex mathematical equations, which acts to verify transactions added to the blockchain.  The party controlling the miner then earns crypto assets as a reward for helping to verify these blockchain transactions.  *Id.*, ¶ 30.

At the time Defendants began promoting Ormeus Global and Ormeus Coin, only a handful of miners, located in Montana, were dedicated to mining on behalf of Ormeus Coin.  *Id.* In December 2017, Defendants transferred mining equipment from a different company they controlled to Ormeus Coin and installed it in a warehouse in Massena, New York.  They struggled to keep this equipment operational and to break even on the cost of operation.  *Id.*, ¶ 32.  In January 2018, the miners in Montana that were dedicated to Ormeus Coin's operations stopped working on behalf of Ormeus Coin and were replaced by miners located in Utah. As of January 2018, therefore, the only crypto asset mining equipment dedicated to Ormeus Coin's mining operation was located in Massena, New York and Utah. Taken together, this equipment was worth less than $1 million.  *Id.*, ¶ 33.

Defendants represented to investors that 40% of the profits of the mining business would be placed into digital wallets known as the "Ormeus Reserve Vault," or "ORV," which would

permanently hold the crypto assets to support the value of Ormeus Coin.  *Id.*, ¶ 20.  Defendants also told investors that they could monitor the value of the Ormeus Reserve Vault on a public website, where it would be displayed.  *Id.*  Investors were told that remaining profits of the mining business would be used to acquire additional crypto asset mining equipment to mine an increasing amount of crypto assets and further support the value of Ormeus Coin.  *Id.*

Defendants offered and sold Ormeus Coin continuously from approximately June 2017 through at least the filing of the Complaint.  *Id.*, ¶ 22.  Ormeus Coin was available for purchase on crypto asset trading platforms, principally Prescott Regency and Cryptopia, through the Barksdales' issuance and distribution of approximately 36 million Ormeus Coins directly to more than 12,800 investors, including at least 230 U.S. residents.  Ormeus Coin's highest market capitalization was $52 million on January 15, 2018, based on its value in U.S. dollars at the time. *Id.*  At no point was this securities offering registered with the Commission.  *Id.*

Defendants also offered and sold Ormeus Global subscription packages from approximately June 2017 through May 2018, through a website available to investors worldwide. *Id.*, ¶ 21.  They raised millions from more than 8,600 investors, including at least 1,000 U.S. residents.  *Id.*  This securities offering was also not registered with the Commission.  *Id.*

As detailed in the Complaint, Defendants engaged in a continuous pattern of fraudulent conduct in effort to lure in investors to their scheme, including:

- Mr. Barksdale falsely claimed to investors including Americans at a Hong Kong public roadshow in November 2017, and for years after, that the company had entered into a contract to purchase $250 million of crypto asset mining equipment, with the promise that the profits generated by this digital mining would be used to support the value of Ormeus Coin.  *Id.*, ¶¶ 23-25.  Similar misrepresentations were made during a January 2018 webinar that was viewed by investors in the United States and around the world. *Id.*, ¶¶ 35-38.

- Defendants engaged in manipulative trading of Ormeus Coin around the time of the November 2017 roadshow in Hong Kong to drive the price of Ormeus Coin higher.

Defendants artificially increased the price of the tokens in order to mislead investors about the value of Ormeus Global subscription packages.  By doing so, Defendants were able to sell $5.7 million worth of subscription packages during the week of the roadshow—more than double the sales in any prior week.  *Id*., ¶¶ 26-29.  Defendants engaged in similar manipulative trading around the time of European roadshows held in January 2018.  *Id*., ¶¶ 39-41.  Defendants engaged in the same fraudulent conduct in connection with an April 2018 roadshow in Bangkok, Thailand.  *Id*., ¶¶ 63-64.

- Ormeus Global performed minimal crypto asset mining during a period that Defendants were representing to investors that they had purchased $250 million of mining equipment.  As of January 2018, the only crypto asset mining equipment dedicated to Ormeus Coin's mining operation was worth less than $1 million.  Around that same time, Ormeus Global's mining revenue was shown in internal documents to be less than $200,000 in the preceding 30 days.  *Id*., ¶¶ 30-34.

- Defendants produced a video in approximately February 2018 that falsely depicted what they claimed to be an Ormeus Coin facility in Montana housing $25 million of crypto asset mining equipment.  At the time the video was published none of the equipment was part of Ormeus Coin's mining operation and only a small portion of the equipment had ever been used to mine for Ormeus Coin, even though the video represented it was all dedicated to that purpose.  This was all done to mislead investors into believing that tens of millions of dollars' worth of mining equipment was actively supporting the value of Ormeus Coin.  *Id*., ¶¶ 42-44.

- Defendants published a whitepaper in approximately February 2018 that misrepresented that Ormeus Coin had $30 million worth of mining equipment in operation that was generating $5.4 million in revenue per month, that those figures had been audited, and that Ormeus Coin had a contract with a hydrodam in New York by which it could obtain inexpensive and clean electricity.  At the time of publication, Ormeus Coin had purchased less than $10 million of crypto asset mining equipment, had only about $1 million of such equipment in actual operation, was producing less than $200,000 of mining revenue per month, had never had its financial statements or mining assets audited, and did not have an agreement with a hydrodam in New York.  *Id*., ¶¶45-47.  An updated version of the Ormeus Coin whitepaper was posted on the Ormeus Coin website in April 2019, which included misrepresentations similar to those in the previous version.  *Id*., ¶ 75.

- Defendants issued multiple press releases in February 2018 and published ads on Twitter and Facebook falsely representing that it had a $250 million crypto mining operation generating millions of dollars in revenue a month.  Mr. Barksdale emailed one of the press releases to all Ormeus Global investors.  *Id*., ¶¶ 49-53.  Defendants published press releases containing similar false information in April 2018, and displayed this information on the Ormeus Coin website.  *Id*., ¶¶ 59-62.

- Defendants hosted a tour in March 2018 in Utah for several hundred U.S. and foreign investors, and filmed it for release to the broader public, which purported to show a fixed data center dedicated to the mining of Ormeus Coin, when in reality no more than $7 million of the equipment actually belonged to Ormeus Global and Ormeus Coin and most

of it would not be operational until April 2018.  Defendants knowingly or recklessly published the video to give the false impression that Ormeus Coin was mining crypto assets on a massive scale.  Subsequent to publishing the video, Defendants again acted to manipulate the price of Ormeus Coin by directing employees to trade directly with each other through accounts held at Cryptopia.  During the period of March 17 through March 30, 2018, Defendants and Ormeus Global employees working at their direction traded 89% of all Ormeus Coins traded and Ormeus Global sold $4.5 million worth of subscription packages, while the price of Ormeus Coin was artificially inflated.  *Id.*, ¶¶ 54-58.

- Despite Defendants' representations to investors that they had a robust mining operation, Ormeus Coin turned off its mining equipment in Utah and New York for over five months in 2018.  When the equipment was turned back on in November 2018, it produced losses of over $100,000.  The equipment in Utah was then permanently shut-off in January 2019.  None of this information was disclosed to investors.  *Id.*, ¶¶ 68-71.

- Defendants and Ormeus Coin told investors that the "Ormeus Reserve Vault" or "ORV" would hold 40% of Ormeus Coin's profits from its digital asset mining operations as a way of supporting the value of Ormeus Coin.  Despite their misrepresentations to investors that Ormeus Coin was earning monthly revenues of over $5 million from its mining activities, in total, the ORV only ever received approximately $2 million in digital assets.  To perpetuate the fiction that Ormeus Coin had a robust crypto mining operation that supported the value of the coin, Defendants negotiated a contract in January 2019 to display a third party's crypto asset wallet on the ORV website rather than the actual assets of the ORV.  The assets displayed had no relation to Ormeus Coin.  This was done to mislead investors into believing that well over $100 million in crypto assets backed Ormeus Coin, when in reality the ORV wallets were holding less than $500,000 in such assets at the time.  *Id.*, ¶¶ 72-74.  The April 2019 whitepaper referred current and prospective investors to the ORV website containing this false information.  *Id.*, ¶ 75.

- Defendants launched the additional crypto assets Ormeus Cash and Ormeus Ecosystem, which purport to run in connection with Ormeus Coin, and made misrepresentations about the mining operations associated with these crypto assets similar to those it had made in touting Ormeus Coin itself.  *Id.*, ¶ 76.

- Through their fraudulent conduct, Defendants raised at least $124 million from over 20,000 investors in the United States and various countries across the globe.  Defendants have used millions of dollars of investor money for their own personal benefit including for travel and to purchase real estate.  *Id.*, ¶ 77.

## **ARGUMENT**

### I.    Default Judgment Standard

"Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a

default judgment." *SEC v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020). "The first step, entry of a default, simply formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id*. (internal quotations omitted). "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by the pleadings." *Id*. at *2 (internal quotation and citation omitted).

Where a defendant has defaulted, "a court is required to accept all of the . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *SEC v. Cole*, 661 Fed. Appx. 52, 53-54 (2d Cir. 2016) (a default "require[s] the court to accept as true the Complaint's factual allegations") (citing *Finkel*). However, a court "is also required to determine whether the . . . allegations establish [defendant's] liability as a matter of law." *Finkel*, 577 F.3d at 84. As set forth below, the allegations establish Defendants' liability.

The SEC seeks three forms of relief against Defendants: an injunction against future violations of the charged securities laws, disgorgement of their illicit profits, and a civil monetary penalty. To determine whether such relief is appropriate as part of a motion for default judgment—absent any counter-evidence proffered by a defendant—courts in this District accept as true all of the Complaint's well-pleaded fact allegations, and also take into consideration any additional evidence the Commission proffers in support of its requested relief. *See Rinfret* at *7; *SEC v. Skelley*, No. 18 Civ. 08803 (LGS) (DF), 2021 WL 863298, at *8-9 (S.D.N.Y. Feb. 25, 2021), *report and recommendation adopted*, No. 18 Civ. 08803 (LGS), 2021 WL 1164594 (S.D.N.Y. Mar. 26, 2021). The Court need not hold a hearing, and may rely on affidavits or

documentary evidence, including the declaration filed herewith.  *See, e.g.*, *Daniello v. Planned System Integration*, No. 07- cv-1729 (RRM), 2009 WL 2160536, at *4 (E.D.N.Y. July 17, 2009); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) ("We have held that, under rule 55(b)(2), it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment.").  With respect to monetary remedies, "the Court 'should take the necessary steps to establish damages with reasonable certainty.'"  *SEC v. Blackout Media Corp.*, No. 09-cv-05454 (GBD) (DF), 2012 WL 4051937, at *4 (S.D.N.Y. May 15, 2012) (quoting *Transatlantic Marine Claims Agency, Inc.*, 109 F.3d at 111), *report and recommendation adopted*, 2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012).

II.    Defendants Offered and Sold Securities

As a threshold matter, the federal securities laws apply to Defendants' conduct because they offered and sold Ormeus Coin and Ormeus Global subscription packages as securities.  As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. 293, 299, 66 S. Ct. 1100, 1103 (1946).  Under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b], an "investment contract" is a security.  In *Howey*, the Supreme Court established a test to determine whether an "unconventional scheme or contract" constitutes an investment contract and is therefore a security.  *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020).  In applying this test, courts evaluate whether the instrument involves the investment of money in a common enterprise with an expectation of profits to be derived from the efforts of a promoter or third party.  *Howey*, 328 U.S. at 298-99, 66 S. Ct. at 1103; *accord United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S. Ct.

9

2051, 2060 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").

Ormeus Coin and the Ormeus Global subscription packages (which included Ormeus Coin) meet the *Howey* test for investment contracts.  First, investors invested money by purchasing both the Ormeus Global subscription packages and Ormeus Coin.  Complaint, ¶ 21 (Defendants raised millions of dollars from the sale of Ormeus Global subscriptions to investors), ¶ 22 (investors purchased Ormeus Coin on digital asset trading platforms, principally Cryptopia).

Second, subscribers into the Ormeus Global subscription packages and Ormeus Coin purchasers each invested in a common enterprise with other subscribers or investors, respectively.  The common enterprise element is satisfied by the existence of horizontal commonality, or the pooling of assets from multiple investors, usually combined with the pro-rata distribution of profits, so that all share in the profits and risks of the enterprise.  *Telegram Grp. Inc.* 448 F. Supp. 3d at 369 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)).  Horizontal commonality is present here for both the subscription packages and the Ormeus Coin, as purchasers' payments were pooled into company accounts and purportedly were to be used by the company to engage in crypto asset trading and mining for the benefit of the investors as a whole.  *See e.g.*, Complaint, ¶¶ 3, 20, 24, 36, 37, 44, 72.  If the development, marketing, and operations of the company were successful, the returns on the subscription packages and value of the Ormeus Coins would theoretically rise together.

Third, purchasers of Ormeus Global subscription packages and Ormeus Coin had a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of

Ormeus' promoters.  "Profit means an 'income or return, to include, for example, dividends, other periodic payments, or increased value of the investment.'"  *Telegram Grp. Inc*, 448 F. Supp. 3d at 371 (quoting *SEC v. Edwards*, 540 U.S. 389, 394, 124 S. Ct. 892, 897 (2004)).  With respect to the subscription packages, on websites, social media accounts, webinars, roadshows, and in press releases, Defendants told investors they would profit from Defendants' expertise in building and maintaining a digital asset trading algorithm that was making and returning profits to investors up to 160 percent.  *See e.g.*, Complaint, ¶¶ 2, 19.  As for Ormeus Coin (which were included as part of the subscription packages, as well as sold separately), Defendants told investors they would profit from Defendants' business expertise in running a digital asset mining operation that was one of the largest in North America and generating millions of dollars in revenue per month.  *Id.*, ¶¶ 6, 75, 76.  They assured investors that 40 percent of the profits from the mining revenue would be placed into a reserve vault to support the value of Ormeus Coin.  *Id.*, ¶¶ 3, 20, 37, 72.  As a result, investors had a reasonable expectation that they would obtain future profits based on the entrepreneurial and managerial efforts of Defendants in trading and mining digital assets.

Accordingly, Defendants' conduct occurred in connection with the offer and sale of securities.  *See SEC v. LBRY, Inc.,* No. 21-cv-260-PB, 2022 WL 16744741, at *8 (D.N.H. Nov. 7, 2022) (holding that defendant offered crypto asset as a security and granting summary judgment in favor of the SEC).

III.    Final Judgment Should Be Entered Against Defendants
        On The SEC's Section 10(b) and 17(a) Claims

    A.    Defendants Violated Sections 10(b)
          of the Exchange Act and 17(a) of the Securities Act

Both the Securities Act and the Exchange Act contain similar, but not identical, anti-fraud provisions.  Under the Exchange Act, "to violate Section 10(b) and Rule 10b–5, a party

must have '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *SEC. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999)).  "A false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'" *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)).

In addition to creating liability for false statements, Section 10(b) and Rule 10b-5(a) "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Sason*, 433 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020) (quoting *SEC v. Jean-Pierre*, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)). Scheme liability exists when "[d]efendants . . . participated in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of creating a false appearance." *Id.* (quoting *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016)).

Section 17(a) applies to offers and sales of securities, "but in other respects are the same as Section 10(b) and Rule 10b–5, except that 'no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) [obtaining money or property through false statements or material omissions] or (a)(3) [engaging in actions operating as a fraud on purchasers].'" *Pentagon Cap. Mgmt. PLC*, 725 F.3d at 285 (quoting *Monarch Funding Corp.*, 192 F.3d at 308).  Scheme liability under Section 17(a)(1) [employing "any device, scheme, or artifice to defraud"] does require "alleging scienter or facts giving rise to a 'strong inference of

fraudulent intent.'"  *Sason*, 433 F. Supp. 3d at 509 (quoting *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017)).

As shown in subsection II *supra*, the Complaint alleges facts establishing that the Ormeus Global subscription packages and Ormeus Coin were offered and sold in securities transactions pursuant to the Securities Act, and that Defendants used the means and instrumentalities of interstate commerce to effect these transactions.  The Complaint also alleges facts supporting all of the remaining elements for fraud claims under Section 10(b) and Section 17(a).

As described in detail above, Defendants repeatedly made material misrepresentations regarding the securities they offered and sold.  "A misstatement in a securities transaction is material if there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'"  *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019) (alteration in original) (quoting *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018)).  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the [misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *SEC v. Sayid*, No. 17 Civ. 2630 (JFK), 2019 WL 6307367, at *7 (S.D.N.Y. Nov. 25, 2019) (alterations in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 983 (1988)), *aff'd*, 860 F. App'x 18 (2d Cir. 2021)).

As described in detail above, Defendants made multiple misrepresentations to investors. Mr. Barksdale beginning in November 2017, and continuing for years after that, falsely claimed to investors and potential investors that the company had entered into a contract to purchase $250 million of digital asset mining equipment, with the promise that the profits generated by this crypto asset mining would be used to support the value of Ormeus Coin.  Complaint, ¶¶ 23-

25, 35-38.  Defendants also produced and published a video in February 2018 that falsely depicted what they claimed to be an Ormeus Coin facility in Montana housing $25 million of crypto asset equipment, in an effort to mislead investors into believing that this equipment was actively supporting the value of Ormeus Coin.  *Id.*, ¶¶ 42-42.  Additionally, Defendants published multiple versions of a whitepaper misrepresenting both the assets supporting Ormeus Coin and the revenue their operations were generating.  *Id.*, ¶¶ 45-47, 75.  In furtherance of their efforts to deceive investors, Defendants issued multiple press releases and published ads on social media making false claims similar to those in the whitepaper.  *Id.*, ¶¶ 49-53, 59-62. Finally, Defendants falsely represented on the ORV website and in their whitepaper that a crypto asset wallet belonging to an unrelated third party, which held over $100 million in crypto assets, was associated with Ormeus Coin, deceiving investors into believing that these crypto assets backed the value of Defendants' token.  *Id.*, ¶¶ 72-75.

In this case, Defendants' misrepresentations were material, as they were designed to make investors believe that Ormeus Coin and the associated subscription packages were profitable ventures.  *See CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 445 ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations.") (quoting *F.T.C. v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 529 (S.D.N.Y. 2000)).  Defendants' misrepresentations were also made with scienter because they were intended to deceive investors into believing they were investing in a security backed by a highly-profitable operation and to manipulate investors into buying Ormeus Coin.  *See SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) ("A false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'") (quoting *Obus*, 693 F.3d at 286).

In addition to the misrepresentations noted above, the Complaint alleges that Defendants engaged in deceptive acts.  For instance, Defendants engaged in manipulative trading of Ormeus Coin around the time of a November 2017 roadshow in Hong Kong, to drive the price of Ormeus Coin higher and to mislead investors about the value of subscription packages.  Complaint, ¶¶ 26-29.  They also engaged in similar fraudulent conduct in connection with European roadshows and one in Bangkok.  *Id*., ¶¶ 39-41, 63-64.  Ormeus Global performed limited crypto asset mining at a time when Defendants were telling investors that they had invested hundreds of millions of dollars in such operations.  *Id*., ¶¶ 30-34.  Defendants also staged a tour of a fixed data center in Utah, and published a video of it, in order to give investors the false impression that Ormeus Coin had a robust crypto asset mining operation supporting the token's value.  Id., ¶¶ 54-58.  Further, despite Defendants' representations to investors that they had a successful mining operation, the mining equipment in Utah and New York was turned off for over five months in 2018; turned back on in November 2018, resulting in losses of over $100,000; and was permanently shut-off in January 2019.  None of these facts were disclosed to investors.  *Id*., ¶¶ 68-71.

Each of these acts was deceptive, as they were intended to give current and prospective investors the false impression that Ormeus Coin and the subscription packages featuring it were valuable assets backed by thriving operations.  *See United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression."); *see also SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020) ("To establish liability, defendants 'must have participated in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of creating a false appearance.'") (quoting *CKB168 Holdings,*

*Ltd.*, 210 F. Supp. 3d at 445) (alterations in original).  Furthermore, the acts were done with scienter as Defendants actions demonstrate a "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *Frohling*, 851 F.3d at 136 (quoting *Obus*, 693 F.3d at 286).

      B.      The Antifraud Provisions of the Securities Act and the Exchange Act
              <u>Apply To Defendants' Conduct</u>

      Under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] United States district courts have jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty" under the Securities Act.  Likewise, under Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], district courts have exclusive jurisdiction over proceedings brought to enforce violations of that Act.

      Congress has specified in the Securities Act and the Exchange Act that the jurisdiction of district courts extends extraterritorially in SEC enforcement actions when certain statutory criteria are met.  *See Liu Meng-Lin v. Siemens AG,* 763 F.3d 175, 181 (2d Cir. 2014) ("In § 929P(b) [of the Dodd-Frank Act], Congress provided the district court with limited extraterritorial jurisdiction over specific types of antifraud suits brought by governmental entities when the conduct at issue has particular types of relationships to the United States."). Specifically, Section 22(c) of the Securities Act provides that:

> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of section 77q(a) of this title involving--
>
> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

16

15 U.S.C. § 77v(c)

In a similar fashion, Section 27(b) of the Exchange Act, grants district courts jurisdiction over the same conduct for actions brought by the SEC "alleging a violation of the antifraud provisions" of the Exchange Act.  15 U.S.C. §78aa(b).  Other courts in this district have recognized that these provisions "permit[] the SEC to bring enforcement actions for certain conduct or transactions outside the United States."  *Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013), *aff'd sub nom Liu Meng-Lin*, 763 F.3d at 175; *SEC v. Gruss*, 859 F. Supp. 2d 653, 664 (S.D.N.Y. 2012) (holding that these provisions allows the SEC to bring civil actions "extraterritorially in certain cases").  In *SEC v. Scoville,* the Tenth Circuit held that, with these provisions, "Congress undoubtedly intended that the *substantive* antifraud provisions should apply extraterritorially" when the statutory criteria are met.  913 F.3d 1204, 1218 (10th Cir. 2019) (emphasis added); *accord SEC v. Morrone,* 997 F.3d 52, 60 n.7 (1st Cir. 2021) (citing *Scoville*).

Here, Defendants—both of whom are U.S. citizens (Complaint, ¶¶ 13-14)—engaged in conduct within the United States that constituted "significant steps" in furtherance of their violation of these antifraud provisions and engaged in conduct outside the United States that had a "foreseeable substantial effect within the United States."  Defendants targeted investors in the United States, and sold Ormeus Global subscription packages to more than 1,000 U.S. residents. *Id*., ¶ 21.  Defendants also issued and distributed Ormeus Coin to at least 230 U.S. investors.  *Id*., ¶ 22.  Defendants held roadshows and webinars to promote their scheme to current and prospective investors, including investors in the United States.  *Id*., ¶¶ 23, 35.

Moreover, Defendants' marketing of their fraudulent scheme was strongly connected to the United States.  In one instance, Defendants published ads on their Twitter and Facebook

accounts, and a video on YouTube, that appeared to show an advertisement for Ormeus Coin being displayed in Times Square.  Complaint, ¶ 51.

Indeed, the centerpiece of Defendants' fraud was their misrepresentations about the existence and profitability of crypto asset mining equipment on U.S. soil.  Defendants heavily promoted their plan to bolster the value of Ormeus Coin with other crypto assets earned through their crypto asset mining operations.  Complaint, ¶ 20.  Despite promoting their robust mining activities, Defendants originally only operated a few pieces of crypto asset mining equipment in Montana.  *Id.*, ¶ 30.  They subsequently transferred mining equipment from a different company they controlled to Ormeus Coin and installed it in Upstate New York.  *Id.*, ¶ 32.  Then, after the mining equipment in Montana stopped being used for Ormeus Coin's operations, it was replaced by miners in Utah where they also placed about $6 million of additional equipment into operation starting in April 2018.  *Id.*, ¶ 33.

Additionally, Defendants produced a video falsely depicting what they claimed was an Ormeus Coin facility in Montana housing $25 million in crypto asset mining equipment, in order to mislead investors into believing that they had robust U.S. mining operations.  *Id.*, ¶¶ 42-44.  They also falsely claimed to have entered into a contract with a hydrodam in New York to obtain inexpensive, clean energy for their mining operations.  *Id.*, ¶¶ 46-47.  Defendants' misrepresentations about their U.S. mining operations supporting the value of Ormeus Coin culminated in a tour they hosted in Utah in March 2018, for several hundred U.S. and foreign investors, purporting to show a fixed data center dedicated to their crypto asset mining efforts.  Id., ¶¶ 54-58.

In short, Defendants conduct within the United States constituted significant steps in furtherance of their fraudulent schemes in violation of federal securities laws.  Further, their

marketing, promotion, and sale of Ormeus Coin and related subscriptions from overseas had both a "foreseeable" and "substantial" impact in the United States, as evidenced by the more than 1,000 U.S. investors who invested in their scheme.

For these reasons, the SEC respectfully asks that the Court enter final judgment against Defendants on its Section 10(b) and Section 17(a) claims.

IV.   Final Judgment Should Be Entered Against Defendants on the SEC's Section 5 Claim

A.   Defendants Violated Sections 5(a) and 5(c) of the Securities Act

Section 5(a)(1) [15 U.S.C. § 77e(a)(1)] prohibits the use of interstate commerce "to sell [a] security through the use or medium of any prospectus or otherwise" without registration. Section 5(a)(1) "is violated when…the mails are used to transmit an offer or other sales literature, to transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways." *United States v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968) (internal quotation marks and citation omitted).  Section 5(a)(2) [15 U.S.C. § 77e(a)(2)] makes it unlawful to "to carry or cause to be carried through" interstate commerce "any such security for the purpose of sale or for delivery after sale."  And Section 5(c) [15 U.S.C. § 77e(c)] proscribes using "means or instruments of transportation or communication in interstate commerce" to make unregistered offers "through the use or medium of any prospectus or otherwise."

As such, "Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock . . . unless the offering is covered by an exemption." *Frohling*, 851 F.3d at 135 (citation omitted).  To establish a violation, the SEC must show "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation and communication and the mails in connection with the offer or sale." *Id*. at 136 (citations and quotations omitted).

No registration statements were filed or in effect for the offers and sales of the Ormeus Global subscription packages or the offers and sales of Ormeus Coin.  Complaint, ¶ 86.  Once the Commission establishes a *prima facie* violation, the defendants assume the burden of proving that the securities offering qualified for an exemption from registration.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S. Ct. 981, 985 (1953).  Defendants have not even appeared in this action, let alone demonstrated the applicability of an exemption from the registration requirements.

As described in detail above, Mr. Barksdale violated Sections 5(a) and 5(c) of the Securities Act by directly offering and selling securities—the Ormeus Global subscription packages and Ormeus Coin—in interstate commerce to the general public, including in roadshows and webinars directed to investors around the world, including those in the United States.  Complaint, ¶¶ 23, 35. Furthermore, any person who engaged in steps necessary to the distribution of the security offered and sold on an unregistered basis is also liable under Section 5.  *Frohling,* 851 F.3d at 136.  Ms. Barksdale violated Sections 5(a) and 5(c) as she engaged in steps necessary to the distribution of the subscription packages and Ormeus Coin.  Along with her brother, she had the crypto asset developed, listed Ormeus Coin on their now-defunct crypto asset trading platform, and was involved in marketing the token and subscription packages.  *See e.g.*, Complaint ¶¶ 1, 2, 14, 16, 21, 22.  Subsequently Ormeus Coin became available for purchase on Cryptopia and other trading platforms.  *Id*., ¶ 16.  Ms. Barksdale was also involved in organizing a tour of the company's mining equipment – critical to the value of the Ormeus Coin – in Utah to U.S. and foreign investors and developed videos of the tour and mining operations in Montana, which were made publicly available.  *Id*., ¶ 54-57.

B.      Section 5 Extends To Defendants' Conduct Because
        <u>They Engaged in Efforts to Create A U.S. Market For Securities</u>

Section 5 is meant "to assure full and fair disclosure in connection with the public

distribution of securities." *See Europe and Overseas Commodity Traders, S.A. v. Banque*

*Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998), *abrogated on other grounds by Morrison v.*

*Nat'l Australia Bank Ltd*., 561 U.S. 247, 130 S. Ct. 2869 (2010) (citations omitted).  As the

Second Circuit elaborated in *Banque Paribas*:

> [T]he registration provisions [of the Securities Act] are designed to
> prevent the offer of securities in the United States securities market
> without accompanying standardized disclosures to aid investors, a
> course of conduct. This conduct, in turn, has the effect of creating
> interest in and demand for unregistered securities. To avoid this
> result, in keeping with Congress's purpose, the registration
> provisions should apply to those offers of unregistered securities
> *that tend to have the effect of creating a market for unregistered*
> *securities in the United States*.

*Id.* (emphasis added). Section 5 thus seeks to regulate actions that would create a domestic

market for securities sold in unregistered transactions.

Section 2(a)(3) of the Securities Act [15 U.S.C. § 77b(a)(3)] defines "offer" to "include

every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a

security, for value."  Other courts in this District in determining whether an offer is domestic for

purposes of Section 5 have examined the Securities Act's definition of an "offer" and

"determined that, for an offer to be domestic, a person or entity must (1) attempt or offer in the

United States, to dispose of securities or security-based swaps or (2) solicit in the United States,

an offer to buy securities or security-based swaps."  *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832

(AT), 2022 WL 762966, at *12 (S.D.N.Y. Mar. 11, 2022) (quoting *SEC v. Goldman Sachs &*

*Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (cleaned up).

Here, there can be no dispute that Defendants acted to create a United States market for Ormeus Coins by offering securities for sale in the United States and soliciting offers to buy securities in the United States.  As detailed above regarding the fraud claims, Defendants targeted investors in the United States, and sold Ormeus Global subscription packages to more than 1,000 U.S. investors.  Complaint, ¶ 21.  Despite having its principal place of business in Hong Kong, Ormeus Global's corporate officers resided in the United States.  *Id*., ¶ 15.  Defendants' marketing material was available online and their website was unrestricted and available to investors in the United States, including more than 1,000 U.S. residents who purchased subscriptions.  *Id*., ¶¶ 21, 35, 75

In particular, Defendants published and a video on YouTube appearing to show Ormeus Coin advertising in Times Square.  Complaint, ¶ 51.  Another social media ad on Twitter stated, "Live from New York City, Ormeus Coin advertising its $250 million Cryptocurrency Mining Farm in Times Square, Manhattan!"  They held roadshows and webinars to promote their scheme to current and prospective investors, which included investors in the United States.  Complaint, ¶¶ 23, 35.  They even hosted a tour in Utah to promote Ormeus Coin to several hundred U.S. and foreign investors.  *Id*., ¶ 54.  All of these actions constitute at the least "attempts" to dispose of securities or "solicitation of an offer to buy" securities, in the United States.

In sum, Defendants' actions did not just "tend to have the effect of creating a market for unregistered securities in the United States," *Banque Paribas,* 147 F.3d at 126, they were in fact deliberately designed to achieve such an effect.  For these reasons, the SEC respectfully asks that the Court enter final judgment against Defendants on its Section 5 claim.

V.    The Court Should Enjoin Defendants Against
      <u>Future Violations of Sections 10(b), 17(a) and 5</u>

 The SEC is authorized by statute to seek injunctive relief against those who engage in

violations of the federal securities laws.  *See* Securities Act Section 20(b) [15 U.S.C. §

77t(b)] and Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)].  Sections 21(d) and (e) of

the Exchange Act [15 U.S.C. § 78u(d-e)]specifically authorize district courts to issue

injunctive relief in SEC actions.  In determining whether to impose injunctions, courts

consider:

> (1) The fact that the defendant has been found liable for illegal conduct;
> (2) the degree of scienter involved; (3) whether the infraction is an
> isolated occurrence; (4) whether defendant continues to maintain that
> his past conduct was blameless; and (5) whether, because of his
> professional occupation, the defendant might be in a position where
> future violations could be anticipated.

*SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir.

2020) (citing *SEC v. Cavanagh*, 155 F. 3d 129, 135 (2d Cir. 1998)).  The Court has discretion to

impose permanent injunctive relief, which is "particularly appropriate 'where a violation was

founded on systemic wrongdoing, rather than an isolated occurrence' and where the defendant's

'persistent refusals to admit any wrongdoing'" make it likely she will commit further

misconduct.  *Id.* (quoting *Frohling*, 851 F.3d at 139).

 Here, permanent injunctive relief is appropriate.  First, as set forth above, Defendants

violated the securities laws.  Second, they knowingly orchestrated a pernicious fraud to scam

unsuspecting investors.  Third, their conduct was not isolated, but was carefully planned and

executed, involved numerous deceptions, and unfolded over a period of years.  Fourth,

Defendants have not accepted any responsibility for their misconduct. Finally, Defendants'

brazen past conduct makes it more likely they will commit further violations of the securities

laws.

For these reasons, the Court should permanently enjoin Defendants from violations of Exchange Act Section 10(b) and Securities Act Sections 5 and 17(a).

VI.   <u>The Court Should Order Defendants to Pay Disgorgement and Prejudgment Interest</u>

Exchange Act Sections, 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. § 78u(d)(3), (d)(5), (d)(7)] authorize courts to order disgorgement of unjust enrichment in Commission enforcement actions.  *Se Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020) ("[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] §78u(d)(5).").[1]  The "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *see also Liu*, 140 S. Ct. at 1942 ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity.").

"[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation.  So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."  *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (internal quotation marks and citations omitted); *see also Rinfret*, 2020 WL 6559411, at *5 ("The SEC is not required to establish with certainty the disgorgement amount, but need only present a 'reasonable approximation of profits causally connected to the violation.'") (quoting *First Jersey Sec.*, 101 F.3d at 1475); *SEC v. Cope*, No. 14 Civ. 7575 (DLC), 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021) ("'[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds[,] . . . the court need not determine the amount of such gains with exactitude.'") (quoting *SEC v.*

---

[1]  On January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which includes the disgorgement provision since codified at 15 U.S.C. § 78u(d)(7).  The NDAA applies to "any action or proceeding that is pending on, or commenced on or after" January 1, 2021.  *Id*. § 6501(b).

*Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)), *aff'd sub nom. SEC v. de Maison*, No. 18-2564,

2021 WL 5936385 (2d Cir. Dec. 16, 2021).  Moreover, the defendant's financial condition is not

material to assessing disgorgement.  *See SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159

(GEL), 2002 WL 1968341, at \*4 (S.D.N.Y. Aug. 23, 2002).  "[T]o withhold the remedy of

disgorgement or penalty simply because a swindler claims that she has already spent all the loot

and cannot pay would not serve the purposes of the securities laws." *Id.*

 In support of this motion, the Commission has submitted the Declaration of Matthew

Reisig ("Reisig Decl.").  Mr. Reisig is an attorney with the SEC who conducted the SEC's

investigation of this matter and is participating in this litigation.  Reisig Decl. ¶ 2.  During its

investigation, the SEC collected publicly available documents and other documents from

relevant third parties and interviewed witnesses.  Some records were obtained voluntarily, while

others were produced pursuant to subpoenas.  The SEC also collected documents directly from

the Barksdales, and others, concerning Ormeus Global and Ormeus Coin.  *Id.*, ¶¶ 4-6.

 Defendants received profits from each of their unregistered offerings, Ormeus

subscription packages and Ormeus Coin. The SEC will address their profits from each

separately.

 A. <u>Defendants' Profited from the Sale of Ormeus Subscription Packages</u>

 As explained below, Defendants earned approximately of $45,215,256 from the sale of

Ormeus subscription packages.

 In 2016, Ms. Barksdale formed a company, Prescott Regency International Ltd. in Hong

Kong.  *Id.*, ¶ 7 & Ex. 1.  When investors purchased crypto asset subscription packages from

Ormeus Global, their funds would be sent to a digital wallet owned by Prescott Regency at a financial technology company in Hong Kong called ANX International Ltd.  *Id.*, ¶ 10 & Ex. 4.[2]

Defendants received monthly statements for Prescott Regency from ANX, which detailed the account's withdrawal and deposit activity, among other things.  *Id.*, ¶ 12 & Ex. 7.  According to these monthly statements, from June 1, 2017 through May 31, 2018, the crypto asset wallet for Prescott Regency received 6,243 bitcoins for Ormeus Global, which Defendants withdrew and had an approximate value in U.S. dollars of $45,215,256.  *Id.*, ¶ 13 & Ex. 10.  This figure thus approximates Defendants' profits from the sale of Ormeus Coin subscription packages.[3]

B.    Defendants' Profited from the Sale of Ormeus Coin

Ormeus Coin was a component of the Ormeus Global subscription packages, but the Barksdales also profited from the sale of standalone Ormeus Coins.

On April 24, 2016, Ms. Barksdale incorporated in Hong Kong iAM Marketing Ltd, which had locations in Richville, New York and Los Angeles, California.[4]  *Id.*, ¶ 14.  Ms. Barksdale opened bank accounts for iAM Marketing at HSBC Bank in Hong Kong on September 7, 2016.  When investors in Ormeus Coin paid in currencies like U.S. dollars instead of bitcoin,

---

[2]  Investors purchased subscription packages by accessing a website registered in the United States (ormeusbackoffice1.com), creating an account, and choosing an investment amount.  Id. ¶ 11 & Ex. 5.

[3]  The value in U.S. dollars of each bitcoin was calculated using the average price per month for bitcoin withdrawn in that month.  *Id.*, ¶ 13 & Ex. 10.  This method was used because the monthly activities statements do not provide a transaction history, and neither Defendants nor ANX provided a transaction history when requested by SEC Staff during the investigation.  Accordingly, the SEC prepared its own summary chart.  *Id.*

[4]  Independent contractors of iAM Marketing who worked to market the Ormeus Global and Ormeus Coin businesses confirmed that JonAtina Barksdale and John Barksdale were the founders and owners of iAM Marketing, which was a consulting company that provided reputation management and marketing services predominantly for companies selling crypto assets.  *Id.*, ¶ 14.

the funds were wired to iAM Marketing's bank accounts at HSBC Bank.  *Id*., ¶ 15 & Ex. 11.
The bank accounts at HSBC also received cash deposits from ANX, which, as described above,
was the company to which Ormeus Global investors sent their bitcoins.  *Id*. ¶ 15 & Ex. 12.
Additionally, the Barksdales were managers of the company JBUltimate LLC which was
incorporated in the State of Nevada on June 26, 2009.  JBUltimate LLC had a bank account at
Bank of America which received checks and wires from investors in the United States for the
purchase of Ormeus Coins.  *Id*., ¶ 16 & Ex. 13.

Through iAM Marketing, the Barksdales coordinated the listing of Ormeus Coin on
Cryptopia, a former crypto asset platform located in New Zealand.   At least 12,800 persons
purchased Ormeus Coin on Cryptopia, including about 2,200 investors who used U.S. IP
addresses.  *Id*., ¶ 17 & Ex. 14.  Although Cryptopia did not require users to provide their physical
location, 230 investors listed physical addresses in the United States.  *Id*., ¶ 17 & Ex. 15.

The Barksdales hired people to work for them, including Michael Anselmi, whom
counsel for the Barksdales identified as a personal assistant to John Barksdale, Joshua Casey
Popovich, who was identified as an independent contractor living in New Zealand, and Brant
Frank, who developed trading algorithms for the Barksdales (collectively with the Barksdales,
"the Barksdale Group").  These persons had accounts at Cryptopia that were used to engage in
manipulative trading by, or at, the direction of the Barksdales.  *Id*., ¶ 18 & Exs. 16, 17, 18, 19;
*see also* Complaint, ¶¶ 27-28.

The Barksdale Group engaged in substantial manipulative trading by trading with each
other or themselves to increase the market value of Ormeus Coin.  Reisig Decl. ¶ 19 & Ex. 20.
The Barksdales and their associates also sold approximately 11.4 million Ormeus Coins to 4,873
investors for a gain of $17,397,914.  *Id*., ¶ 20 & Ex. 21.  The Barksdale Group also purchased

approximately 4.2 million Ormeus Coins from 3,226 investors for an expense of $7,352,668.

The net proceeds from these transactions was $10,045,245.  *Id*., ¶ 20 & Ex. 22.

Thus, the combined total for the proceeds collected from the fraudulent sale of Ormeus

Global subscription packages ($45,215,256) and the sale of Ormeus Coins ($10,045,245) equals

$55,260,501.  *Id*., ¶ 22.

     C.     <u>Deduction for Expenses Related to the Purchase of Mining Equipment</u>

Records reflect that Mr. Barksdale transferred approximately 846 bitcoins, valued at the

time at about $8,963,038, to a company in North America to purchase and host mining

equipment for the benefit of Ormeus Global.  *Id*., ¶ 21.  The payment served as a deposit

pursuant to an agreement that Mr. Barksdale executed in 2017.  *Id*., ¶ 16 & Exs. 23, 24, 25.

Subtracting this amount spent on mining equipment for the benefit of Ormeus Global, leaves at

least $46,297,463 in investor funds in Defendants' hands.  *Id*., ¶ 22.

Under *Liu*, "courts must deduct legitimate expenses before ordering disgorgement under

§ 78u(d)(5)."  140 S. Ct. at 1950.  Giving Defendants the benefit of the doubt that this

$8,963,038 payment constitutes a legitimate business expenditure under *Liu*, Defendants should

still have to disgorge the remaining $46,297,463 in investor funds. This amount represents a

reasonable approximation of Defendants' ill-gotten net profits and thus satisfies the criteria set

forth in *Liu*. Moreover, Defendants bears any risk of uncertainty in calculating the disgorgement

amount because their illegal conduct created the uncertainty. *See SEC v. Patel,* 61 F.3d 137, 140

(2d Cir. 1995).

This disgorgement request is consistent with both the new provision for disgorgement in

Exchange Act Section 21(d)(7) [15 U.S.C. § 78u(d)(7)] and *Liu*'s holding that disgorgement

should be distributed to harmed investors where feasible when awarded pursuant to Exchange

Act Section 21(d)(5)'s [15 U.S.C. § 78u(d)(5)] equitable relief provision.  *See Liu*, 140 S. Ct. at

1948-49.  If the Commission is able to collect the requested disgorgement from Defendants, it intends to make a distribution to harmed investors, if feasible. *SEC v. Penn*, No. 14 Civ. 581 (VEC), 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31 2021) (holding that a commitment by the Commission to conduct a feasibility analysis of distribution of any disgorgement funds and to advise the Court for further consideration if distribution was infeasible, was consistent with *Liu*), *aff'd* No. 21-1348-CV, 2022 WL 2517218 (2d Cir. July 7, 2022).  Defendants should be held liable on a joint and several basis for the disgorgement award because they collaborated in perpetrating their fraudulent scheme.  *See Pentagon Cap. Mgmt.*, 725 F.3d at 288 ("joint and several liability for combined profits on collaborating parties is appropriate.") (quoting *SEC v. AbsoluteFuture.com*, 393 F.3d 94, 97 (2d Cir.2004) (cleaned up).

      D.    <u>Prejudgment Interest</u>

      Finally, the Commission respectfully requests that the Court award prejudgment interest on any disgorgement it orders.  The Court has discretion in awarding prejudgment interest, and if so, the appropriate interest rate thereon. *See First Jersey Sec., Inc*., 101 F.3d at 1476. Prejudgment interest is important to deny the wrongdoer his unlawful gains. *SEC v. Dang*, No. 20 Civ. 01353 (JAM), 2021 WL 1550593, at *7 (D. Conn. Apr. 19, 2021).  "In determining prejudgment interest, it is appropriate to use the IRS underpayment rate, and the interest should be compounded quarterly and calculated 'for the entire period from the time of defendants' unlawful gains to the entry of judgment.'"  *SEC* v. *Tecumseh Holdings Corp.*, No. 03 Civ. 5490 SAS, 2011 WL 2076466, at *2 (S.D.N.Y. May 24, 2011) (quoting *First Jersey Sec., Inc.*, 101 F.3d at 1476-77).  The SEC calculated prejudgment interest on the $46,297,463 in disgorgement beginning in May 2018, when the last investor funds were added to Defendant's crypto asset

wallet at ANX.[5]  Reisig Decl. ¶ 23.  Prejudgment interest on this amount through the time of the

filing of the complaint in March 2022 is $10,044,822.  *Id*. ¶ 23 & Ex. 26.

VII.    <u>The Court Should Impose Civil Penalties on Defendants</u>

The Securities Act and the Exchange Act authorize the Court to impose civil money

penalties for violations of the securities laws.  *See* 15 U.S.C. § 77t(d) [Securities Act § 20(d)]

and 15 U.S.C. § 78u(d)(3)(B) [Exchange Act § 21(d)(3)(B)].  Through the civil penalty

provisions, Congress sought to deter future violations of the securities laws.  "The Remedies Act

[creating the penalties] . . . achieve[s] 'the dual goals of punishment of the individual violator

and deterrence of future violations.'"  *SEC v. Coates*, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y.

2011) (quoting *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996)).

Both the Securities Act and the Exchange Act "authorize three tiers of monetary penalties

for statutory violations."  *Razmilovic*, 738 F.3d at 38 (citing 15 U.S.C. § 77t(d); 15 U.S.C. §

78u(d)(3)).  The Court may impose a third-tier penalty where the violation involved fraud, deceit

or manipulation and "the violation directly or indirectly resulted in substantial losses or created a

significant risk of substantial losses to other persons."  *Id*. at 38 (quoting the statutes).  "Though

the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left

up to the discretion of the trial court."  *SEC v. Riel*, 282 F. Supp. 3d 499, 528 (N.D.N.Y. 2017)

(citation omitted).  To determine an appropriate penalty, courts consider:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's
> scienter; (3) whether the defendant's conduct created substantial losses . . . to
> other persons; (4) whether the defendant's conduct was isolated or recurrent; and
> (5) whether the penalty should be reduced due to the defendant's current and
> future financial condition.

---

[5]  Using this date, besides simplifying the calculation for the Court, works to Defendants'
favor as they began receiving investor funds in June 2017.

*SEC v. Rajaratnam*, 918 F.3d 36, 4-45 (2d Cir. 2019) (noting that these factors are not "an exhaustive list . . . and are not to be taken as talismanic"); *see also Razmilovic*, 738 F.3d at 38-39 (not an abuse of discretion to consider defendant's lack of remorse and efforts to flee the country); *Alpine Secur. Corp.,* 413 F. Supp. 3d at 245 (courts may also consider "a defendant's lack of cooperation with authorities" and the "brazenness, scope and duration of illegal conduct") (citations and quotation omitted).

A third-tier penalty is appropriate in this case.  Defendants' conduct involved fraud, deceit, manipulation, and substantial investor losses.  Not only did Defendants flout the securities laws through their unregistered offerings of securities, they lied to and stole from investors in doing so.  *See SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009) (third-tier penalties appropriate for defendant who violated Section 5's registration requirements and whose "dissemination of materially false information create[d] a significant risk of substantial loss to the investing public"), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).

A third-tier penalty "for each violation shall not exceed the greater of (i) [the specified amount], or (ii) the gross amount of pecuniary gain" to the defendant as a result of the violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3).  Gross pecuniary gain is similar to disgorgement except that a defendant is not entitled to deduct money returned to victims.  "Otherwise, a defendant who paid back all of the gains before judgment could practically nullify the statutory penalty." *SEC v. Amerindo Investment Advisors, Inc.*, No. 05 Civ. 5231(RJS), 2014 WL 2112032, *11 (S.D.N.Y. May 6, 2014), *aff'd*, 639 F. App'x 752 (2d Cir. 2016).  Because in the Second Circuit penalties cannot be assessed on a joint and several basis, the Court must look to the individual gains of the defendant.  *Id*. (citing *Pentagon Cap. Mgmt.*, 725 F.3d at 287-88).

31

Here, the Defendants have made no attempt to apportion between them the at least $46,297,463 million in gross pecuniary gains their schemes generated.  Moreover, even when civil penalties cannot be imposed on a joint and several basis, "multiple defendants can 'each benefit from the same dollar of gain,' in which case each can be penalized for that gain."  *Cole*, 661 F. App'x at 55; *see also SEC v. Fowler*, 440 F. Supp. 3d 284, 299 (S.D.N.Y. 2020) ("[W]here multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violation."), *aff'd* 6 F.4th 255 (2d Cir. 2021); *Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *11 (same).  Additionally, here the Defendants are brother and sister, and worked closely together in perpetuating the fraudulent scheme, such that the Court could fairly conclude that they benefited equally from their fraud.[6]  Given the failure of Defendants to provide the Court with any mechanism by which to apportion culpability, the SEC respectfully requests that the Court apportion the pecuniary gain evenly between the Defendants.  Under that calculation, each Defendant would be assessed a $23,148,731 penalty, reflecting half the total pecuniary gain.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court enter the attached proposed final judgment.

---

[6] Although both Defendants engaged in fraudulent conduct, arguably Mr. Barksdale's conduct outlined in the Complaint was even more egregious than that of Ms. Barksdale.  Once again, however, the Defendants have provided the Court no means by which to assess the relative pecuniary gain that each realized for purposes of assessing penalties.

Dated: March 7, 2023

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

/s/ *Christopher J. Carney*
Melissa J. Armstrong*
Christopher J. Carney
Matthew B. Reisig

*Admitted *pro hac vice*

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: 202-551-2379 (Carney)
carneyc@sec.gov